UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY EARL BEFFREY,

                Plaintiff,          Case No.: 11-cv-11310
                                  Honorable   Thomas L. Ludington
      v.                        Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 15]**

Plaintiff Timothy Beffrey brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 15] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Beffrey was not disabled from his amended alleged onset date of February 1, 2003, because he retained the residual functional capacity to perform a substantial number of jobs in the national economy. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [15] be **GRANTED**, Beffrey's Motion for Summary Judgment [8] be **DENIED** and that, pursuant to sentence four of

42 U.S.C. § 405(g), the Commissioner's decision be **AFFIRMED**.

## II.    REPORT

### A.    Procedural History

On December 19, 2006, Beffrey filed an application for DIB and SSI, alleging disability as of November 16, 2001. (Tr. 124-31). The claims were denied initially on February 14, 2007. (Tr. 66-69; 71-74). Thereafter, Beffrey filed a timely request for an administrative hearing, which was held on September 10, 2009, before ALJ Gregory M. Hamel. (Tr. 33-61). Beffrey, represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Michelle Robb. (*Id.*). On September 25, 2009, the ALJ found Beffrey not disabled. (Tr. 13-31). On January 24, 2011, the Appeals Council denied review. (Tr. 1-4). Beffrey filed for judicial review of the final decision on March 30, 2011 [1].

### B.    Background

#### 1.    Disability Reports

In a disability report filed on December 19, 2006, Beffrey reported that the conditions preventing him from working were "degenerative disk disease, arthritis, severe stenosis, heart attack." (Tr. 147). He reported that his degenerative disc disease "causes excruciating pain, numbness, limited mobility, head aches [sic], sight lost [sic], limited range of motion." (*Id.*). His arthritis caused "limited range of motion, stiffness, [and] pain." (*Id.*). His stenosis caused "partial paralysis, shortness of breath, anxiety, sight lost [sic], pain, lack of sleep, mood swings, lack of concentration [and] heart attack." (*Id.*). He stated that his cervical disc disease resulted from a "broken neck." (*Id.*). Beffrey reported that these conditions limited his ability to work because he was unable to hold his head down to fill out the disability report, could not lift over five pounds and could not climb ladders. (*Id.*). He reported that attempting to remember simple

things caused him stress, and that his headaches and neck pain prevented him from carrying out day-to-day functions and even interfered with his ability to use the bathroom. (*Id.*).

Beffrey reported that his condition became disabling on November 16, 2001,[1] when he suffered an injury on the job. (*Id.*). He received a settlement as a result of that injury, and he reported having a heart attack on January 29, 2005, the day his benefits ended. (*Id.*). Beffrey reported that he saw numerous doctors for his conditions, and was then on several medications: aspirin, Imdur, Lopid, Metoprolol, Plavix, Prinivil and Zocor for his heart attack, Ativan and Buspar for panic attacks, and Motrin for the swelling and pain in his neck. (Tr. 153-54).

In a disability field office report filed the same day, Beffrey's interviewer noted that Beffrey appeared to have difficulty sitting and using his hands. (Tr. 144). The interviewer documented that Beffrey's "hands were really shaky when trying to hand me things and writing," and that he "turned extremely red and kept massaging his neck as if in pain." (*Id.*).

In a function report dated January 6, 2007, Beffrey reported that he lived in a house with family. (Tr. 161). He reported that on good days he would try to do house or light yard work, but would need to stop "every hour or two for a rest." (*Id.*). On bad days, he would get up and spend his day on the couch or floor "not moving" his head or neck. (*Id.*). He reported that he had trouble sleeping with the panic attacks, but that the medicine for them made him "useless." (Tr. 162). Beffrey reported no problems with his personal care except difficulty putting his shoes on when his neck was "acting up." (*Id.*). He reported that he prepared food such as frozen dinners or soup daily, taking him about ten minutes at a time. (Tr. 163). He reported that he regularly swept, cleaned the house, did laundry and light yard work, which took between 2-4

---

[1] At the hearing, Beffrey's counsel modified his alleged onset date from November 1, 2001, to February 1, 2003, relating to an MRI taken in February 2003 showing impingement on Beffrey's spinal cord. (Tr. 59).

hours with a break.  (*Id.*).  He reported he needed someone else to do these chores when he could not due to pain.  (*Id.*).

Beffrey reported that he would go out on "good days" when there was no rain or snow, and that he was able to walk, drive and ride in a car.  (Tr. 164).  He reported shopping for food a few times a month.  (*Id.*).  He reported that he liked sports and watching racing and golf on television, and that while he was able to watch television, he could no longer play sports because of his condition.  (Tr. 165).  He watched games on television with friends at their houses once a week.  (*Id.*).  Beffrey reported that his conditions interfered with his abilities to the extent he was only able to lift five pounds, could not squat, bend, or kneel, standing made his leg go numb, reaching hurt his neck, he had blurred vision and tasks took him a long time to complete because he would lose focus.  (Tr. 166).  He also reported a shortened temper since his condition.  (*Id.*).  He was able to walk ¼ mile before needing to rest for five minutes and was able to pay attention for only one minute.  (*Id.*).  He also reported having trouble in closed confined spaces.  (Tr. 167).

In a third-party disability report filed by Beffrey's sister, with whom he lived, his sister reported that Beffrey was capable of doing some light house work, lawn work, and meal preparation.  (Tr. 173).  She reported that it took him one hour a day for the housework and one to two hours a week for the yard.  (Tr. 175).  She reported that he had insomnia and that his conditions prevented him from performing "full physical activities" or "gainful employment." (Tr. 174).  She reported that Beffrey went outside daily, that he was able to drive, and that he shopped once a week for an hour for food.  (Tr. 176).  She confirmed he watched television with friends weekly.  (Tr. 177).  She reported the same limitations in Beffrey's abilities as he did, though she did not check the box next to "completing tasks."  (Tr. 178).  She reported Beffrey could walk a half mile before needing a ten minute break and that he could concentrate for five

minutes at a time.  She reported he had a temper and "no patience."  (*Id.*).  She commented that she could no longer afford to completely care for her brother, and that he needed "more complete medical care in order to become an individual who can contribute to society."  (Tr. 180).

In a disability appeals report dated March 1, 2007, Beffrey reported that his condition had worsened in that he had reinjured his neck and he had more chest pains and panic attacks.  (Tr. 185).  He alleged that these changes occurred on June 1, 2006.  (*Id.*).  In addition to the medications previously listed, Beffrey indicated he was also being prescribed Nitro for his heart.  (Tr. 187).  He stated that the worsening of his conditions meant that some days he could not even shower and other days he was slower.  (Tr. 188).

## 2.    *Plaintiff's Testimony*

At the hearing, Beffrey testified that he became disabled when he slipped and fell on jet fuel while working at the airport, herniating several discs in his neck which progressively turned into degenerative disc disease.  (Tr. 37).  He testified that he lived with his sister who had been laid off the previous year.  (*Id.*).  Beffrey testified that his day consisted of trying to stretch out his back and neck and walking, though he could not walk far or his legs would go numb.  (Tr. 38).  He would wander around the house, walk in the yard, do dishes occasionally, and try to vacuum, though it would hurt his neck.  (*Id.*).  He testified that he did laundry occasionally and cooked, though his leg would go numb from standing.  (*Id.*).  He testified that he also occasionally mowed the lawn if his brother started the mower so that he could just walk behind it, but that his leg would go numb after 5-6 minutes of walking.  (*Id.*).  He testified that he drove twice a week to the grocery store and would occasionally visit a friend's house to watch a baseball game.  (Tr. 39).  He testified that he took a trip one hundred miles to Detroit as a car passenger the previous February.  (*Id.*).

Beffrey testified that the injury had caused leakage of disc fluid into his spine which turned into a bone spur that was impinging on his spine. (Tr. 40). He testified that the pain in his upper neck was an eight on a scale of one to ten, and that he would pass out if he turned his head too fast. (Tr. 39-40). He testified that on some days he had trouble seeing and found it nearly impossible to read a magazine or newspaper, due to impingement on his spinal cord. (Tr. 40). He testified that his neck condition caused his hands and legs to go numb several times a day, and it had also given him severe headaches. (Tr. 41). He testified that he had trouble gripping things because of the radiating pain and numbness in his arm. (Tr. 47). He testified that originally the doctors treated him conservatively, hoping the problem would resolve itself, but now they were considering surgery. (Tr. 48). However, the insurance Beffrey had was limited and difficult to deal with. (*Id.*). He testified that his last MRI showed that his condition had "really turned a corner and gotten real bad" due to the impingement of his spinal cord by the bone spur. (Tr. 49). Thus, the doctors were trying to get him a consultation with a neurosurgeon. (Tr. 49-50).

When asked about the side effects of his medications, Beffrey testified that he suffered from headaches, irritability, anxiety and a lack of concentration. (Tr. 45). He also testified that he had difficulty sleeping, and would get 45-50 minutes of sleep at a time, which caused him to have less energy during the day and need to nap. (Tr. 45-46). He also testified that he suffered from panic attacks because his neck would seize up at night making it hard to breathe and causing him to panic. (Tr. 46). When asked about his work, Beffrey testified that he had worked as a baseball umpire and hockey referee for many years, but that he also had to have a second job as well, which varied and included a job at a theater, and then at the airport. (Tr. 43-44).

### 3. Medical Evidence

As Beffrey's brief focuses solely on the ALJ's analysis regarding his back and neck pain, and related issues, the court will consider only the medical evidence relating to those conditions.

#### a. Treating Sources

On November 19, 2001, Beffrey was treated by Dr. Ben Mayne for pain in his neck and shoulder resulting from a slip and fall on jet fuel while he was loading bags into a plane at work. (Tr. 211). He reported pain in his shoulder, radiating toward his neck and down his arm, with numbness in his fingers. (*Id.*). Upon examination, Dr. Mayne noted irritation in Beffrey's shoulder, with pain and weakness and limited range of motion, as well as pain in his neck. (*Id.*). Dr. Mayne ordered an MRI of his shoulder and an EMG to evaluate the possibility of cervical radiculopathy. (*Id.*). An MRI of Beffrey's left shoulder on December 6, 2001, by Dr. Mayne was unobtainable due to Beffrey's claustrophobia. (Tr. 209). A December 21, 2001 follow-up appointment noted that an MRI was ultimately taken of Beffrey's left shoulder, as well as an EMG, both of which showed no serious pathology. (Tr. 210). However, Dr. Mayne believed Beffrey's rotator cuff strain was due to an impingement, and wanted to start him on physical therapy. (*Id.*). Dr. Mayne saw Beffrey again a month later, on January 24, 2001. (*Id.*). Beffrey reported that physical therapy had been helping until a new therapist increased his weights, which worsened his condition and caused spasms. (*Id.*). However, Dr. Mayne noted that Beffrey's range of motion had improved, as had his pain level. (*Id.*). He recommended continued physical therapy as well as an evaluation with a Dr. Bergeron, for myofacial pain and return to work concerns. (*Id.*). Dr. Mayne stated that it would "still be a while before he is ready to go back to his usual job given the amount of lifting he does." (*Id.*). At a follow up appointment in March 2001, Beffrey reported that his shoulder was better, but that he was

suffering from discomfort in his neck. (*Id.*). He told Dr. Mayne that his consultation with Dr. Bergeron resulted in an MRI that showed a herniated cervical disc. (*Id.*). Dr. Mayne discontinued treatment at this point because he found there was nothing more to be done for Beffrey's shoulder and that Dr. Bergeron would be treating his neck. (*Id.*).

On April 4, 2002, Beffrey had a neurosurgical consultation with Dr. Mark Adams. (Tr. 370-71). Beffrey reported excruciating pain in his neck and at the base of his head since his injury that radiated to his left shoulder and caused intermittent tingling in both hands. (Tr. 370). He denied radiation down his right arm. (*Id.*). Upon examination, Dr. Adams noted that Beffrey had symmetric strength and deep tendon reflexes in his extremities, but had limited range of motion in his neck. (*Id.*). Dr. Adams noted a previous MRI which showed a disc herniation, but which went to his right, rather than his left side. (*Id.*). Based on this, Dr. Adams concluded that it was "hard to fully explain his symptoms as they related to the MRI of his neck," as Beffrey was describing "primarily left shoulder pain as it relates to his disc herniation." (Tr. 371). Dr. Adams suggested a conservative course of treatment. (*Id.*).

On April 15, 2002, Beffrey was treated by Dr. N. Siddiqui of the St. Mary's Spine and Rehabilitation Clinic. (Tr. 384-85). Dr. Siddiqui reviewed Beffrey's previous EMG on his left arm and his MRI results and noted that despite those results, "[s]urprisingly, Mr. Beffrey's symptomatology is predominantly along the left" side of his body and that Beffrey did "not have any other complaints." (Tr. 384). Upon examination, Dr. Siddiqui noted no significant cervical tenderness, but a reduced range of motion. (*Id.*). He noted normal flexation and extension at the cervical spine and a full range of motion in Beffrey's lower spine, as well as normal hand grip and no sensory deficits. (*Id.*). Dr. Siddiqui diagnosed Beffrey with cervical and left shoulder pain, prescribed Vioxx and physical therapy, and placed Beffrey under the following work

restrictions: "no lifting over 30 pounds, no repetitive bending, no climbing and no overhead work." (Tr. 385).

At a follow-up appointment on May 16, 2002, with Dr. Adams, Beffrey reported getting better with physical therapy and "making marvelous progress." (Tr. 369). At a May 23, 2002 appointment with Dr. Siddiqui, Beffrey reported that he currently was not working due to his work restrictions but was "becoming more active at home." (Tr. 383). He reported that physical therapy was helping him, and upon examination Dr. Siddiqui noted improved range of motion and no tenderness to palpation. (*Id.*). He continued the course of physical therapy and work restrictions. (*Id.*). At an appointment on June 20, 2002, Beffrey reported making good progress in physical therapy except for a setback he had with a new therapist and different exercises. (Tr. 382). Upon examination, Dr. Siddiqui noted no tenderness and good range of motion generally, but some slight tenderness on rotation and lateral bending bilaterally. (*Id.*). Dr. Siddiqui concluded that Beffrey had "plateaued" with therapy and that a functional capacity evaluation was warranted because Beffrey's employer was unable to accommodate the work restrictions "unless those are of a more permanent nature." (*Id.*). He scheduled a functional capacity evaluation for June 24, 2002, and a follow-up visit for July 1, 2002, but there are no further records in the file relating to treatment by Dr. Siddiqui or any evaluation performed on Beffrey's capacity at this time. (*Id.*).

At an appointment on October 8, 2002, with Dr. Adams, Beffrey reported that he went to the emergency room for the numbness in his hand which resolved spontaneously. (Tr. 367). Beffrey reported that his "neck pain and numbness ha[ve] resolved completely at this point," although upon examination, Dr. Adams did note slightly diminished reflexes in his right bicep. (*Id.*). At an appointment on December 10, 2002, Beffrey reported no improvement in his

symptoms which were radiating down his arm and getting worse. (Tr. 368). Beffrey also reported numbness in one leg after a long car ride. (*Id.*). Dr. Adams ordered a new MRI scan to be performed. (*Id.*). An MRI from February 6, 2003, showed a "[m]oderate-sized right paraforaminal disc herniation with associated spurring causing mild impression upon the cord and moderate to severe right-side foraminal stenosis" that was "unchanged since 3/25/02." (Tr. 363). At an appointment on February 18, 2003, Beffrey reported continued radicular pain and requested massage therapy. (Tr. 366). Dr. Adams noted that "if this fails to improve his symptoms, he may be a candidate for a cervical discectomy and fusion." (*Id.*). At an appointment on October 28, 2003, Beffrey reported that a prescription for Soma had been helping to improve his condition, though he had more neck pain on the day of the appointment because he had run out of the medication. (Tr. 365). Upon examination, Dr. Adams noted that Beffrey's strength remained intact and that, since Beffrey wanted to avoid surgery and there were no new neurological findings, there was no need for an updated MRI. (*Id.*).

Beffrey was treated in the emergency room on November 24, 2003 for neck pain and arm numbness. (Tr. 305-307). Beffrey reported that he had "on and off significant neck pain for . . . well over a year now" after his accident, and that he had "some neuropathy in his hands from time to time." (Tr. 305). He reported having woken up that morning with increasing neck pain and complete numbness in his right hand after hearing a "pop" when he rolled over. (*Id.*). After the doctor applied a cervical collar, Beffrey reported that his numbness had improved greatly during the triage period. (*Id.*). Upon examination, the doctor noted good and equal bilateral strength and sensation in his upper extremities, full range of motion bilaterally in his shoulders, elbows, wrists and hands. (Tr. 306). The doctor noted a minimal amount of cervical spinal tenderness. (*Id.*). A cervical spine x-ray showed no obvious fracture. (*Id.*). The doctor

consulted Dr. Adams who agreed that Beffrey could be discharged with a collar and have an outpatient MRI. (*Id.*).

At a February 6, 2004, appointment with Dr. Adams, Beffrey reported continued pain in his neck after his injury that had been making some minor improvement, but was intensified with activity. (Tr. 364). Dr. Adams noted that while Beffrey had symmetric strength, the duration of the test was limited due to significant pain. (*Id.*). Dr. Adams also noted that Beffrey wanted to avoid surgery, so he said he would reevaluate if Beffrey at some point became a surgical candidate. (*Id.*).

On September 25, 2004, Beffrey was evaluated by Dr. Gerald Schell, a neurosurgeon. Beffrey reported a relapse of severe pain in his back and right shoulder. (Tr. 387). Upon examination, Dr. Schell noted that Beffrey was stiff, had some weakness proximally and had a hard time elevating his right arm above his head. (*Id.*). Dr. Schell noted a significant reduction in Beffrey's range of motion as well as a fair amount of cervical spasm. (*Id.*). Dr. Schell recommended a continued course of conservative treatment with an updated MRI to determine if Beffrey would benefit from surgery. (*Id.*). An MRI on November 1, 2004, revealed a "[s]table appearing moderate size focal right paraforaminal disc herniation at C4-5 with associated spurring causing mild impression upon the thecal sac and moderate to severe right sided foraminal stenosis," which was unchanged since his last MRI on February 6, 2003. (Tr. 293). It also documented that the cervical cord was intact without abnormal signal. (*Id.*). On November 29, 2004, Dr. Schell wrote a letter to Dr. Dermot O'Brien noting that a recent MRI of Beffrey's neck showed that his displacement had healed and that he was doing very well. (Tr. 213). Dr. Schell also noted that he "reassured" Beffrey and would see him back if further problems or questions arose. (*Id.*).

Beffrey's primary physician was Dr. Greg Pinnell, who worked with a physician assistant ("PA"), Amy Young-Smith. (Tr. 275). Beffrey was seen on March 17, 2005, but there was no notation regarding his neck or back at this appointment. (Tr. 288). Nor was there a notation about his back or neck at an appointment on May 17, 2005. (Tr. 287). At an appointment on September 6, 2005, the nurse noted that Beffrey reported his cervical spine "getting worse" and that his right leg "goes numb" with walking. (Tr. 286). However, there were no other notations on the treatment notes in relation to these two complaints and no diagnosis or alteration in Beffrey's treatment plan on account of them. (*Id.*). There were no notations regarding neck, back or leg pain at appointments on November 17, 2005, December 5, 2005, or January 17, 2006. (Tr. 283-85).[2]

At an appointment on July 14, 2006, Beffrey reported that he heard a "pop" in his neck and the doctor noted there was a possible bulge, his fingers were numb and he had a limited range of motion. (Tr. 282). Beffrey felt as if he may have re-ruptured a cervical disc. (*Id.*). The doctor ordered an MRI on Beffrey's neck. (*Id.*). At a follow-up on August 14, 2006, Beffrey reported "new alarm signs" since his injury, neck pain, and tingling. (Tr. 281). Upon examination the doctor observed a limited range of cervical motion. (*Id.*). He re-ordered the MRI, and also an evaluation by a neurosurgeon. (*Id.*). At an appointment on December 7, 2006, PA Young-Smith noted that Beffrey had originally injured his neck six years prior but that it had "worsened recently." (Tr. 280). He had been evaluated by a "Dr. Field" and a "Dr. Shall" (presumably Dr. Schell) two years prior, but did not want to undergo surgery at that time. (*Id.*).

---

[2] On November 29, 2005, Beffrey was treated in the emergency room for an assault from which he sustained injuries to his face, including a broken nose and a laceration behind one of his ears requiring stitches. (Tr. 234-240). An X-ray of his left forearm, and CT scans of his head and facial bones, revealed a broken nose, but no other abnormalities. (Tr. 235-37). An examination showed no cervical spine tenderness and no paraspinal tenderness in the neck. (Tr. 239).

PA Young-Smith noted Beffrey had reinjured his neck recently working in his back yard. (*Id.*). Upon examination, she found limited range of motion in Beffrey's neck and pain with palpitation at C6-C7. (*Id.*). She diagnosed cervical disc disease with radiculopathy and again ordered an MRI with a neurosurgical consult and prescribed Motrin for the pain. (*Id.*). However, at an appointment on December 19, 2006, there was no mention of neck or back pain in the treatment notes, nor was there mention of such pain at an appointment on March 16, 2007. (Tr. 279; 408). There are also no records in the file showing an MRI or neurosurgical consultation during this period of time.

At an appointment on August 15, 2007, Beffrey reported lower back pain "since he lifted a trash can full of concrete," causing him knots in the right side of his back, and his right thigh to go numb. (Tr. 407). Upon examination, PA Young-Smith noted limited range of motion and four out of five muscle strength bilaterally, as well as some tenderness to palpation. (*Id.*). She diagnosed lower back pain and prescribed Vicodin, heat and rest. (*Id.*). At an appointment on October 25, 2007, PA Young-Smith noted that Beffrey was in to discuss an MRI, reporting that he still had back pain and was unable to work because of it. (Tr. 406). She examined his bilateral L5 area and noted that he had a stable gait and that his coordination and strength were intact. (*Id.*). She diagnosed him with low back pain and kept his medications the same. (*Id.*). In a letter dated November 5, 2007, physician assistant Young-Smith wrote "To Whom It May Concern" that Beffrey was "totally disabled and unable to work due to herniated disks [sic] in his cervical and lumbar areas." (Tr. 353). She did not elaborate further on this statement. (*Id.*). At an appointment on December 20, 2007, Beffrey reported needing a letter for disability and that he was "doing okay – trying to stay upbeat despite pain." (Tr. 405). PA Young-Smith diagnosed him with chronic neck and back pain with two herniated discs and continued his medications.

(*Id.*). There was no notation of back or neck pain at an appointment on January 29, 2008. (Tr. 404). On July 15, 2008, Beffrey reported no change in his back, and PA Young-Smith diagnosed lower back pain and continued his medications. (Tr. 403). There was no mention of neck or back pain at a July 31, 2008 appointment. (Tr. 402). At an appointment on August 22, 2008, Beffrey requested renewed disability paperwork, and upon examination PA Young-Smith noted stiff movement in his neck and back. (Tr. 401). She diagnosed him with lower back and cervical pain. (*Id.*). On the same day, PA Young-Smith wrote another letter "To Whom It May Concern," stating that Beffrey had been "totally disabled since February of 2003" due to "degenerative disc disease, cervical stenosis, herniated discs, and very limited mobility in neck and lower back areas." (Tr. 362). She also noted that Beffrey had "a history of CAD [coronary artery disease], hypertension, anxiety and myocardial infarction." (*Id.*). Her letter was also signed by a physician, Dr. Eugene Seals. (*Id.*).

At an appointment on October 31, 2008, Beffrey complained of right knee pain, but not of back or neck pain, and no mention of any musculoskeletal pain was noted at either his November 21, 2008 or December 30, 2008 appointments. (Tr. 375-77). At a January 16, 2009 appointment, Beffrey reported again needing paperwork for disability and that his back had gotten worse and the pain was going down his left leg. (Tr. 374). He reported stopping Motrin due to the effect it had on another unrelated condition. (*Id.*). Upon examination, PA Young-Smith noted a positive straight-leg raising test bilaterally and limited range of motion. (*Id.*). She diagnosed lower back pain and placed Beffrey on Vicodin. (*Id.*). At an appointment on May 5, 2009, Beffrey reported pain between his shoulder blades, but the doctor appeared to interpret this as more of a cardiac rather than a musculoskeletal issue. (Tr. 397). At an appointment on July 30, 2009, Beffrey reported cervical and lumbar spine problems, numbness and tingling in his

right leg that was happening more often, and that he wished to see a neurologist. (Tr. 396). An examination of his lower back and cervical spine revealed tenderness upon palpation and reduced strength in both his arms and legs. (*Id.*). He was diagnosed with lower back pain with radiculopathy and an MRI and neurosurgical consultation were ordered. (*Id.*).

An MRI of Beffrey's cervical spine from August 5, 2009, showed a "[d]ominant ostephyte at C4-C5 on the ride side causing effacement of the thecal sac and impingement of the spinal cord." (Tr. 372-73). There was also "neural foraminal compromise seen at this level on the right side." (*Id.*). However, there was no comparison of this MRI to any previous MRI. An MRI taken the same day of his lumbar spine revealed a "minimally bulging annulus without superimposed disc herniation at L4-L5." (Tr. 438). At an appointment with PA Young-Smith on August 27, 2009, Beffrey reported numbness in his legs, and that he was exercising several days a week until symptoms occurred. (Tr. 395). Upon examination, PA Young-Smith noted limited range of motion in his neck in all directions. (*Id.*). She ordered a neurological consultation and continued his medications. (*Id.*). She also wrote another "To Whom It May Concern" letter, almost identical to her prior one, but this time adding that Beffrey was scheduled to see a neurosurgeon for his current symptoms relating to his neck and back and that his condition was worsening "with neurological findings that occur on a daily basis." (Tr. 389). This letter was not signed by a physician. (*Id.*).

b. *Consultative and Non-Examining Sources*

A physical RFC assessment was conducted on February 14, 2007 by Dr. Delois Daniels based on a review of Beffrey's records. (Tr. 339-46). Dr. Daniels opined that Beffrey was capable of lifting twenty pounds occasionally, ten pounds frequently, standing and/or walking six hours of an eight hour work day and sitting the same amount. (Tr. 340). He had an unlimited

ability to push or pull.  (*Id.*).  Dr. Daniels opined that Beffrey could frequently climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but could only occasionally climb ladders, ropes or scaffolds.  (Tr. 341).  He found that Beffrey had no manipulative, visual, commutative or environmental limitations.  (Tr. 342-43).

4.     *Vocational Expert's Testimony*

Michelle Robb, the VE, testified that Beffrey's past work as an umpire would be classified as light and semi-skilled, and his work at the airline as heavy to very heavy and skilled. (Tr. 52-54).  His other jobs included maintenance worker (which was medium and semi-skilled), courier (light and unskilled), hotel security guard (light and unskilled), store clerk (medium and unskilled), auto service writer (light or medium and skilled), and light and sound technician (medium and semi-skilled). (Tr. 52-53).  The ALJ then posed a hypothetical question involving a person with Beffrey's background, who could perform light work, but could not perform overhead work, could not climb or work around hazardous environments, and could not perform repetitive bending.  (Tr. 55-56).  The VE was asked whether such a person could return to Beffrey's past work.  (Tr. 56).  The VE said that such a person could return to jobs such as courier, auto service writer, or hotel security guard.  (*Id.*).

The ALJ then posed a hypothetical in which a person of Beffrey's background could perform work at the light level, but could only occasionally engage in all postural limitations, and could only perform routine and repetitive tasks with no production pace, meaning with no specific time to complete tasks or a quota to meet.  (Tr. 56-57).  The ALJ testified that based on that hypothetical, such a person could not perform Beffrey's past work, but could perform a number of other jobs at the light, unskilled category such as cashier (28,000 jobs) and dishwasher (4,300 jobs).  (Tr. 57).

The ALJ then added the restriction that the level of exertion needed to be sedentary rather than light. (*Id.*). The VE testified that such a person could perform a number of jobs including information clerk (2,000 jobs) and general office clerk (3,800 jobs). (Tr. 57-58).

Finally, the ALJ asked what effect an additional limitation of only occasional handling with the non-dominant hand would have on the jobs previously listed. (Tr. 58). The ALJ testified that such a limitation would eliminate all previously listed jobs, and that there would be no jobs that would accommodate that additional restriction. (*Id.*).

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Beffrey was not disabled. (Tr. 16-27).  At Step One, the ALJ determined that Beffrey had not engaged in substantial gainful activity since his revised alleged onset date.  (Tr. 18).  At Step Two, he found that Beffrey had the following severe impairments: "degenerative disc disease; disc herniation; [ ] coronary artery disease, and a panic disorder."  (*Id.*).  At Step Three, the ALJ determined that Beffrey's impairments alone or in combination, neither met nor medically equaled a listed impairment.  (Tr. 19-20).  The ALJ next assessed his residual functional capacity ("RFC") finding that he had the capacity to perform light work with the additional restrictions that he could only occasionally climb, balance, stoop, kneel, crouch or crawl, and that he could only do routine and repetitive tasks that did not involve a production pace.  (Tr. 21).  At Step Four the ALJ determined that, based on his RFC, Beffrey could not return to his past relevant work.  (Tr. 25).  Finally, at Step Five, the ALJ concluded that based on his age, education, experience and RFC, there were a significant number of jobs in the national economy that Beffrey could

perform, rendering him not disabled. (Tr. 26). The ALJ determined that this would be the case even if the class of work which he could perform was limited to sedentary work with the additional restrictions listed in the RFC. (*Id.*).

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499

F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.  Analysis

Beffrey argues that the ALJ failed to adequately assess his credibility regarding his subjective complaints. Beffrey contends that that error resulted in: (1) the ALJ posing a hypothetical question to the VE that did not adequately take into account all of his limitations, and (2) the ALJ's conclusion that he retained the RFC to perform a substantial number of jobs in the national economy. A review of the record and decision, however, demonstrates that the ALJ committed no error warranting remand.

Sixth Circuit case law makes clear that determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Secretary of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981)*, quoting Beavers v. Secretary of Health, Ed. &*

*Welfare*, 577 F.2d 383, 387 (6th Cir. 1978).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters,* 127 F.3d at 531.  Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

In this case, after finding at Step Two that Beffrey had the severe impairments of degenerative disc disease, disc herniation, coronary artery disease and a panic disorder, the ALJ concluded that Beffrey had the RFC to perform a reduced range of light work with the additional limitations of only occasional climbing, balancing, stooping, kneeling, crouching or crawling, and only performing routine and repetitive tasks that do not involve a production pace.  (Tr. 18-21).  In reaching this conclusion, specifically as it relates to Beffrey's degenerative disc disease and disc herniation which are the subject of his appeal, the ALJ considered both Beffrey's subjective complaints and the objective medical evidence.  (Tr. 21-25).

The ALJ specifically referenced and addressed Beffrey's testimony (1) that he was incapable of working due to pain in his neck that radiated to his shoulders, (2) that he experiences headaches and numbness in his right hand and right leg, (3) that he had no strength in his hands and that he dropped things all the time.  (Tr. 21; 23).

The ALJ noted that there was "nothing in the record to support his contention as his alleged headaches were not well-documented in the record." (Tr. 23).

With regard to his numbness and lack of strength in his hands, the ALJ noted that there was "nothing in the record to support his condition" or that it caused him to consistently drop things, citing various medical records demonstrating that Beffrey had retained normal grip strength in 2002 and 2003, and that his work restrictions only limited him to lifting no more than 30 pounds, which, the court notes, is a lesser restriction than the one utilized by the ALJ in posing the hypotheticals to the VE at the hearing (*i.e.*, "light work," which by definition involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."). (Tr. 23, 55-57, 366, 382-84; 20 C.F.R. § 404.1567(b)). In fact, with respect to one incident of numbness in his hand, Beffrey reported that it resolved spontaneously. (Tr. 367).

It is true that the ALJ did not address Dr. Schell's finding on September 25, 2004, that Beffrey had "major weakness proximally in his right arm." (Tr. 387). However, the court finds no error in the ALJ's decision not to discuss that evidence, as Dr. Schell's November 29, 2004 treatment notes revealed that by that point, Beffrey's displacement had "healed." (Tr. 213). Furthermore, the MRI from November 2004 revealed that Beffrey's condition was "unchanged" from his 2003 MRI, (Tr. 293), and in October of 2003, Dr. Adams had noted that Beffrey's strength remained intact. (Tr. 365). Therefore, any error on the ALJ's part in failing to address Dr. Schell's treatment notes relating to Beffrey's arm weakness was harmless. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless).

The ALJ's decision contains a detailed discussion of Beffrey's claimed neck pain and radiculopathy. The ALJ cited the fact that Beffrey's February 2003 MRI findings were

essentially unchanged from his February 2002 MRI. (Tr. 22). In addition, the ALJ noted a gap in his treatment with the neurologist until October 2003, and at that appointment he revealed his condition had improved with medication. (Tr. 22, 365). The ALJ further noted that a November 2004 MRI showed no new abnormalities despite Beffrey's complaints of increased pain during visits to his neurologist. (Tr. 22, 293). The ALJ also cited the fact that Beffrey's neurologist reviewed the MRI and determined that the displacement had healed and that Beffrey was "doing well." (Tr. 22, 213). The ALJ noted that Beffrey's symptoms appeared to worsen after he heard a pop in his neck in 2006, but that despite this, he continued to receive conservative treatment of medication alone, with no injections or emergency room visits. (Tr. 22). The ALJ noted that Beffrey did not even appear to seek treatment for his neck pain once in 2007, and the medical records correspond to that, showing that Beffrey's complaints during that time revolved mainly around his lower back pain, although the court notes that there is some ancillary citation to his cervical pain in the record, as outlined above. (*Id.*). The ALJ went even further beyond the time period in question, evaluating records from 2008 and 2009 and noting that Beffrey's primary physician found his condition to be stable and continued to conservatively treat him. (*Id.*). The ALJ cited the 2009 MRI which showed an impingement on Beffrey's spinal cord, but that even with that finding, Beffrey was still receiving conservative treatment. (*Id.*). Based on this evidence, the ALJ concluded that there was nothing in the record that appeared to preclude Beffrey from the limited range of light work the ALJ found he was capable of. (*Id.*).

In making an adverse credibility determination, the ALJ went beyond the mere lack of corroborating medical evidence discussed above. In addition, he cited Beffrey's relatively conservative treatment and daily activities, which he determined belied a claim of total disability. Beffrey takes exception with the ALJ's decision in those regards. Beffrey argues that the ALJ's

reliance on his receipt of only conservative treatment was error because Beffrey testified that this was partly due to his insurance status. (Plf. Brf. at 10). However, many of the treatment notes discussed above show that it was Beffrey himself who was, for apparent non-monetary reasons, attempting to avoid having more aggressive treatment, including surgery. (*See e.g.* Tr. 364-65). Beffrey also argues that his reported activities of daily living do not support the ALJ's RFC assessment. The ALJ noted that Beffrey and his sister reported that he was able to take care of his personal care, prepare meals, do household chores, drive and grocery shop, and that these activities were consistent with the ALJ's RFC assessment. (Tr. 24). Beffrey argues that the ALJ failed to consider that he performed most of these tasks in short bursts, taking time to rest, and that on bad days he would sit on the sofa or lay on the floor and not move his head or neck. (Plf. Brf. at 12). However, the ALJ stated that he took into consideration all of the evidence and found Beffrey's statements not credible to the extent they conflicted with the RFC assessment. (Tr. 21). In doing so, the ALJ considered both Beffrey's and his sister's function reports. (Tr. 24). The ALJ is not required to discuss every piece of evidence in the record, and his credibility determination cannot be disturbed absent a compelling reason. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006); *Smith*, 307 F.3d at 379 (an ALJ's credibility determination will not be disturbed "absent compelling reason").[3]

---

[3] Beffrey also argues that the ALJ's reliance on his multiple jobs as a possible reason for his continued unemployment, in addition to referencing his cocaine use, was error because Beffrey explained the circumstances surrounding both – that he had many jobs because they were to supplement his income as an umpire, and that his cocaine use was a one-time transgression. (Plf. Brf. at 11; 14). Whether the ALJ erred in this regard is irrelevant here, where it does not appear that he relied on either of these conclusions in assessing Beffrey's RFC. In addition, the ALJ explained why he found many other areas of Beffrey's claims not fully credible, such that his

For these reasons, the court finds that the ALJ did not err in assessing Beffrey's credibility, and as a result, the hypothetical questions he posed to the VE properly took into consideration all of the limitations the ALJ found credible. *Burbo v. Comm'r of Soc. Sec.*, No. 10-2016, 2011 U.S. App. LEXIS 26143 (6th Cir. Sept. 21, 2011) *citing Stanly v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994) (an ALJ is only required to pose those hypothetical limitations that he finds credible). Thus, the ALJ appropriately relied on the VE's testimony to determine that Beffrey was not disabled during the time period in question.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Beffrey's Motion for Summary Judgment [8] be **DENIED**, the Commissioner's Motion for Summary Judgment [15] be **GRANTED** and this case be **AFFIRMED**.

Dated: May 1, 2012                                  s/David R. Grand
Ann Arbor, Michigan                                 DAVID R. GRAND
                                                    United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and

overall credibility determination is supported by substantial evidence and cannot be disturbed by the court. *See Smith*, 307 F.3d at 379.

Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 1, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager